SHIPPEN *et al. v.* FOLSOM; *et vice versa.*

No. 15235, 15239.  SEPTEMBER 5, 1945.  REHEARING DENIED NOVEMBER 19, 1945.

66

*John M. & James J. Slaton,* for plaintiffs in error.

*Neely, Marshall & Greene,* contra.

JENKINS, Presiding Justice. ■ The first and second divisions of the syllabus do not seem to require elaboration. This is the first case in this court involving the declaratory judgment statute,

and some general observations on the nature and character of the act would seem to be in order. Prior to its approval on February 12, 1945, a distinguished member of the Savannah bar, Robert M. Hitch, in a paper published in the November, 1944, issue of the Georgia Bar Journal, used this language: "To advocate, at this late date, the cause of the declaratory judgment procedure is somewhat akin to a defense of the automobile as an efficient and workable machine for everyday transportation; the airplane as a vital and integral unit of the modern army; and the radio as an inexpensive and effective instrument for homespun entertainment and the dissemination of news and varying political beliefs. In this sphere of legal procedure, the day of the pioneer is over; the early reluctance of the judiciary to receive it as a constitutional means of dispensing efficient and prompt justice to litigants has largely evaporated, and the bar itself now welcomes it as a useful and effective tool in its legal workshop." Our General Assembly having passed such a statute, it is highly important to clearly determine its meaning, scope, and fundamental purpose. In the case of Robinson v. Kerrigan, 151 Cal. 40 (90 Pac. 129, 12 Ann. Cas. 829, 121 Am. St. R. 90), the court uses this language: "The refinements of civilized life, and the necessity for the orderly regulation, determination, and protection of human affairs and rights of property, have long required the extension of the judicial power beyond the settlement of controversies which have actually arisen, so as to include the function of providing security against disputes and claims which may arise." In a textbook by Walter H. Anderson on Declaratory Judgments, page 11, we find this language: "Doubtless it was designed to afford security and relief against uncertainty and to guide parties to a contract or occupying other legal or jural relations as to their future conduct with a view to avoid litigation, rather than in aid of it, and to settle and fix rights at a time before there had been breaches of contracts, violation and disregard of rights of others, and thus promote peace, quiet, and justice, with the ultimate end always constantly in view that one of the chief purposes is to declare rights rather than to execute them." Reverting to the article by Mr. Hitch, he quotes the following aphorism: "Under the present law you take a step in the dark and then turn on the light to see if you stepped into a hole. Under the declaratory judgment

law you turn on the light and then take the step." In harmony with this idea, Mr. Anderson in the work by him, referred to, uses this language on page 12: "It should not be supposed, however, that the Declaratory Judgment Act was designed to supplant existing remedies or to usurp fixed jurisdiction in other tribunals, but it is an alternative or additional remedy to facilitate the administration of justice more readily. Some courts, however, have fallen into the erroneous notion that the Declaratory Judgment Act was designed to supply remedies for deficiencies in the judicial system." As we understand the beneficent purposes and intent of the act, it was not intended in some ambiguous way to blot out "at one fell swoop" innumerable rights and privileges bestowed by the Code and by the fundamental principles of law, but was intended by the very meaning and concept of the word to give additional protection to persons who may become involved in an actual justiciable controversy, in that they differ between themselves as to what their rights are, and who wish to find them out before taking some dangerous step which might or might not be authorized. It would be hard to criticise the beneficent purpose of such a remedial statute as thus employed.

■ As to the correctness of the construction by the trial judge of the several features of the contract, we think that little, if anything, can be added to the mere setting forth of the several propositions embodied in the statement of facts and the clear-cut and forthright judgments rendered thereon, other than with respect to the holding made by section five of the decree. This holding was as follows: "The court is further of the opinion that the language quoted in paragraph 4 with reference to percentage should and does apply to any space occupied by the lessee and members of his family for living quarters, and that the terms of the written contract should not be allowed to be varied by any custom of the trade to the contrary notwithstanding. The court is of the opinion that the plain language of the contract requires this holding." The language of paragraph 4 of the lease referred to in this section of the opinion, with respect to percentage rental over and above the minimum guaranteed rental, is as follows: "A percentage of the gross room and apartment receipts of the lessee from the operation of said hotel apartment in excess of fifty-eight thousand eight hundred ($58,800.00) dollars."

It appears from the evidence that during the first several months of the lease there was a third person (Black) who acted as manager, and that he occupied two rooms, rent free. The correspondence does not appear to indicate that any controversy arose as to the propriety of such conduct. The controversy arose when the lessee sought the aid of the landlord in ousting a tenant occupying five rooms, which it was thought, but for the rules of the O. P. A., could be more advantageously disposed of, and the lessee, in order to obtain possession, made affidavit that he wished to occupy these five rooms for himself and family. The evidence is uncontroverted that it is the universal local custom in Atlanta for a lessee manager of such property, holding under a percentage basis, to have the use of not less than two rooms free of any such charge, although the evidence with respect to the Candler Hotel is not in point, since the lease itself so provided in that case. While "the custom of any business or trade shall be binding only when it is of such universal practice as to justify the conclusion that it became, by implication, a part of the contract" (Code, § 20-704 (3)), and it is also true that such custom cannot be used to contradict the express terms of the contract itself (*Vardeman* v. *Penn Mutual Life Insurance Co.,* 125 *Ga.* 117 (2), 54 S. E. 66, 5 Ann. Cas. 221; *Colfax Gin Co.* v. *Buckeye Cotton Oil Co.,* 24 *Ga. App.* 610, 101 S. E. 697), it does not appear in the instant case that the language of the quoted provision of the contract as to the "gross room and apartment receipts" excludes by its terms the operation of such proven universal custom, but on the contrary it is wholly silent on that question. Accordingly, we think that, under the undisputed evidence at the time of the interlocutory hearing, the decree of the court was in this respect erroneous.

*Judgment affirmed in part, and reversed in part on both the main bill and the cross-bill. All the Justices concur.*